Jose L. BELIZ, et al.,
Plaintiffs-Appellants
Cross-Appellees,

v.

W.H. McLEOD & SONS PACKING COMPANY, Defendant-Appellee Cross-Appellant,

Waldo Galan, Defendant-Appellee.

No. 83–1478.

United States Court of Appeals,
Fifth Circuit.

July 22, 1985.

William H. Beardall, TX Rural Legal Aid, Inc., Farm Work Div., Hereford, Tex., for Jose L. Beliz, et al.

James A. Williams, Kevin J. Keith, J. Donald Stevenson, Jr., Dallas, Tex., for W.H. McLeod & Sons.

Waldo Galan, pro se.

Before THORNBERRY, RUBIN, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

To meet his harvesting needs, a South Carolina farmer engaged a farm labor contractor to recruit migrant workers in Texas and transport them to South Carolina. While the contractor was registered as required by the Farm Labor Contractor Registration Act,[1] his registration did not authorize him to transport and house work-

ers, and the contractor committed several other statutory violations while providing the workers to the farmer. The district court found that the farmer did not check the contractor's registration, as the statute required, provided substandard housing for the workers, and did not obtain or maintain statutorily required payroll records. The court rendered judgment in favor of each migrant worker and against the farmer for $200 and against the contractor for $500, for statutory violations, but refused to hold the farmer vicariously liable for the contractor's violations. The court further found that the farmer was not the workers' "employer" under the Fair Labor Standards Act[2] and that the workers could not recover unpaid minimum wages from the contractor because they had not proved the number of hours they had worked.

On the workers' appeal, we reverse the judgment in part, for we conclude that the farmer was liable as an employer for wages under the Fair Labor Standards Act and that the workers were not to be faulted for their inability to prove their hours of work. We remand for further proceedings in accordance with that Act. We affirm the judgment in other respects, holding that the amount awarded for the other statutory violations was not so small as to constitute an abuse of the district court's discretion. We dismiss as untimely the farmer's cross appeal asserting lack of *in personam* jurisdiction.

I.

The case turns on the relationship among Waldo Galan, a registered farm labor contractor who lived in Dimmitt, Texas, W.H. McLeod and Sons Packing Company (McLeod), a South Carolina agricultural producer that grew, harvested, and shipped cucumbers, tomatoes, and beets in Beaufort County, South Carolina, and three families of migrant workers who travelled from Texas to South Carolina in May 1979 to pick crops in McLeod's fields at the solicitation of Galan.

---

1. 7 U.S.C. §§ 2041 *et seq.*

2. 29 U.S.C. §§ 201 *et seq.*

McLeod, a partnership owned and operated by two cousins, W.H. ("Mac") McLeod, Jr. and Claude E. McLeod, Jr., ships vegetables in interstate commerce. The company owns the land on which it grows its vegetables, the farm implements and machinery necessary to the growing operation, and a packing house where the produce is graded, packed, and loaded onto trucks for delivery to market. McLeod directly employs six to eight full-time tractor drivers, an employee to supervise the tractor drivers, and a full-time mechanic. It harvests and packs vegetables in May and June of each year, using a seasonal work force of company employees to operate its packing house during the harvest and packing season. The seasonal harvesting is performed by two, sometimes three, crews of harvest workers. One of these harvest crews consists of local farm workers and additional labor is provided by migrant farm workers.

Galan recruited migrant workers to work on various crops in different seasons. He had travelled to South Carolina with migrant workers to harvest McLeod's crops each spring from 1975 through 1978. He testified that he understood that McLeod counted on him to bring a crew each year unless a particular problem came up. Either Claude or Mac McLeod telephoned Galan from South Carolina early in 1979, asking him to provide at least fifteen pickers for the spring harvest and informing him that the crew would be needed for the entire harvest season. Galan said he had been ill and did not know whether he would be able to do so. Galan later telephoned one of the McLeods and said he would be able to recruit workers. In one of these conversations, McLeod agreed to provide housing for the workers during their stay in South Carolina.

Galan recruited Jose Beliz, who had a wife and seven children, Jose A. Gonzales, who had a wife and ten children, and Juan and Susana Marquez, the families who are plaintiffs in this suit, as well as several other families who are not plaintiffs, in all about forty-five persons. In a later telephone call, perhaps initiated by Galan, Galan told one of the McLeods that he lacked money to transport the workers to South Carolina. McLeod telegraphed $800 to Galan to finance the trip. Galan gave $150 to Jose Beliz, who had an automobile, so that the Beliz family could travel to South Carolina. He used the rest to pay his own and the other workers' transportation expenses. He transported some of the workers in his produce truck, others in his van. Some travelled, like the Beliz family, in their own vehicles.

McLeod planned to house the workers in a building that had once been a motel. Although there was considerable dispute about the condition of the building, the adequacy of the furnishings, the potability of the water, the cleanliness of the outdoor chemical toilets, and other matters, the district court found that the housing "did not meet minimum standards of habitability." It had no beds, stoves, refrigerators, gas or electricity, and no indoor toilets. Moreover, because more people arrived than McLeod had expected, there was not enough room in the building to house all of them. McLeod therefore made a good faith attempt to find and equip additional accommodations. The company rented several trailers, brought beds and mattresses to the motel, and provided additional cooking accommodations. McLeod explained that not only did Galan bring more people than were expected, but that the work parties brought by Galan in prior years consisted mostly of male workers who usually used one cook and a single kitchen. The families who came in 1979, however, wanted separate facilities.

The migrant workers picked tomatoes, cucumbers, beets and squash. This was routine, unskilled work, which consisted of placing the vegetables in buckets and carrying them to Galan's truck where the buckets were dumped into one of sixteen produce bins carried on the truck and furnished by McLeod. When the bins were full, the driver, who had travelled to South Carolina with Galan and his wife, drove the truck to McLeod's packing shed where the bins were emptied. Workers were paid by

the bucket for tomatoes (30¢), cucumbers (30¢) and squash (30¢) and by the bundle for beets (25¢). Several workers testified that their work was made less productive because the crop was meager and it took longer to fill a bucket than it would have taken had the crop been bountiful. In addition they testified that there was a good deal of rain and, although they did not pick crops in the rain, when they returned to the fields picking was retarded by the dampness. No effort was made by either Galan or McLeod to keep any record of days or hours worked by anyone, total pay per hour, or the relationship of the pay received to the minimum wage.

Mac McLeod generally stayed in the fields to supervise the harvest work. He directed whether or not the Texas crew would work on any given day, decided daily which field was ready for harvest, and specified the fields in which the crew would work and the order in which it would work them. He determined throughout the course of each day when to move the crew from one field to another or from picking one crop to picking another. He sought to make sure that the crews did not skip any fields or fall behind in their work. He checked the bins to make sure the workers were picking the correct size produce and were filling the bins to the top. He told the crewleader, Galan, who in turn told the workers, what size produce to pick and gave instructions on how to harvest those crops that the crew did not already know how to harvest. If he saw a worker damaging vines, he told the crewleader to warn the worker. He had authority, although he did not find it necessary to exercise it, to instruct the crewleader to fire an individual worker if the worker persisted in doing the job improperly or to lay off any worker who appeared to be of school age if he thought the worker should be in school.

Galan directly supervised the field work and did not himself pick crops. He sometimes drove the truck picking up the harvest and he also transported workers to and from work and to and from other places in South Carolina from time to time. Although Mac McLeod testified that it was up to Galan to fix the rates paid the workers, the workers complained about the rate to McLeod on at least one occasion and Galan testified that McLeod was "pretty much the one who sets the prices that you pay per bucket," although Galan later indicated that he set the per-bucket rate. While Galan was in South Carolina McLeod advanced funds to him to buy tires and a battery for his truck and McLeod's mechanic repaired the truck when needed, without charge to Galan.

At the end of each week, McLeod prepared work sheets showing the number of bins of produce picked and the amount due Galan. Those sheets showed the rate per bin and also the rate per bucket. Although the workers were actually paid 30¢ per bucket for tomatoes, these sheets showed the rate as 40¢ per bucket. The amount to be paid Galan was determined on the basis of the total number of bins delivered, then deducting part of the cash advanced to Galan for the trip, the cost of buckets, and the cost of workers' compensation carried in McLeod's name and naming McLeod as employer. McLeod then paid Galan in cash and he in turn paid the workers in cash, based on the buckets picked, keeping the rest for his expenses and profit. McLeod had deducted social security taxes in prior years but, as a result, McLeod was required to pay unemployment tax, so it did not deduct social security in 1979 and Galan did not make any social security payments.

The testimony about the hours some of the crew members worked was inexact. Some of the children may indeed have worked little. Some of the families took several days off from work. No record of any of this was kept. However, several workers testified that they and their children worked eight or nine hours a day, five or six days a week, and that they occasionally worked on Sunday. Mrs. Marquez testified, without contradiction, "I remember some days adding up to see how much we would make.... I would make $7.00 and my ex-husband would make another $7.00" for a seven or eight hour day. Workers

also testified that some of the older children worked the same number of days and hours as the adults. The district court found, with ample support from the testimony, that "work was done by at least some members of the crew eight to nine hours per day for five or six days each week they were on" the McLeod farm, but "the Beliz family only worked two weeks."

The district court also found that McLeod "paid Galan a sufficient sum of money for work to be performed on their land by plaintiffs." But there is nothing in the record to show the total number of hours worked by the crew or every individual crew member and nothing to show that the gross sum received by Galan would have sufficed to pay each worker the minimum wage due for hours worked, even without regard to possible overtime.

The amount McLeod paid Galan for the pay period ending May 18 was $1,415.57. In addition to the Beliz, Gonzales, and Marquez families, all of whom are plaintiffs, the Galan crew included the Luna family of seven, the Morales family, which appears to have included four workers, and the Garza family of two workers. Excluding the Marquez family, whose wages were not recorded, Galan paid all of these together a total of $510.29 for the first four-day week. Assuming he paid the Marquez family $50, twice the amount paid the two-worker Garza family, he paid the workers $560.29 for that week. Assuming they worked eight hours a day for four days, the workers would have worked 928 hours. The minimum wage in 1979 was $2.90 per hour. The minimum pay due the entire crew would have been $2,691.20. If only the adults in the families worked, they would have worked 384 hours. Therefore, the minimum total wage for the adults only would have been $1,113.60. If the children worked, on the average, only four hours a day, the seventeen children would have worked 272 hours in that week and the

minimum total wage due them would have been $788.80.

Because neither Galan nor McLeod maintained records of the hours worked by these laborers during this pay period, we cannot determine the exact total number of hours worked by each crew member. But it is undisputed that the crew members were hired to work during this period, that McLeod needed their work, and that they did work. The data we have summarized indicate that the workers were paid less than $1.00 per hour worked. The record contains data that will permit similar computations to be made for the next two weeks, with similar results. The only reasonable conclusion is that Galan did not pay the workers the minimum wage and that McLeod did not pay an amount sufficient for Galan to do so even had Galan taken no part of the compensation for himself, his wife, or the driver who assisted him.

Galan was registered as a farm labor contractor under the Farm Labor Contractor Registration Act,[3] but he had not met the statutory and regulatory prerequisites for authorization to transport[4] or house[5] workers. The district court found, with full support in the record, that McLeod failed to ascertain whether Galan had authority to transport and house workers although McLeod knew he was doing so.[6] Neither Galan nor McLeod had registered to house workers and the housing did not conform to statutory and regulatory standards.

Neither before nor during the workers' employment did Galan or McLeod disclose to the workers the true terms and conditions of their employment or of their housing. Indeed, as the district court found, Galan gave the workers false and misleading information about their employment, failed to keep his oral agreements with them, housed them in substandard housing,

3. 7 U.S.C. §§ 2041 *et seq.,* repealed Pub.L. 97–470, Title V, § 523, Jan. 14, 1983, 96 Stat. 2600.

4. 7 U.S.C. § 2044(a)(2), (4); 29 C.F.R. § 40.51(c) (1984).

5. 7 U.S.C. § 2044(a)(4); 29 C.F.R. §§ 40.20 and 40.51(e) (1984).

6. *See* 7 U.S.C. § 2043(c); 29 C.F.R. § 40.53(c) (1984).

failed to maintain and provide to McLeod necessary payroll records, and failed to provide the workers with pay statements. McLeod remedied none of these deficiencies, failed to ascertain whether Galan was properly registered under the Farm Labor Contractor Registration Act to perform the activities that he undertook for McLeod,[7] and failed to obtain from Galan or itself to maintain the payroll records required by both the Farm Labor Contractor Registration Act and the Fair Labor Standards Act.[8] Neither Galan nor McLeod paid unemployment compensation or social security taxes on the wages paid the workers.

The district court concluded that it had personal jurisdiction over McLeod because a representative of the company had telephoned Galan in Texas and the company had entered into an oral contract for him to provide McLeod with farm laborers and had sent $800 to him in Texas. It also decided that McLeod had intentionally violated the Farm Labor Contractor Registration Act by failing to obtain from Galan or maintain the prescribed payroll records and by failing to determine whether he was registered to perform the services he rendered.[9] The court found that Galan had violated ten separate provisions of the Act and rendered judgment against Galan for $500 per plaintiff, a total of $8,000, and against McLeod for $200 per plaintiff, a total of $3,200, for these violations.

The district court concluded, however, that Galan was not an agent or employee of McLeod for purposes of either the Fair Labor Standards Act or the Farm Labor Contractor Registration Act, although it made no findings of fact to support this conclusion. Similarly, the court concluded that McLeod was not the employer of any of the workers within the meaning of the Fair Labor Standards Act, but that Galan

alone was their employer, again without stating the facts on which the conclusion was based and without discussing the legal criteria this circuit has set forth for deciding that question. Finally, the district court held that, under the Fair Labor Standards Act, the burden is on the employee "to prove by a preponderance of the evidence ... the number of hours [he] actually worked and ... the amount of wages due to [him] for the work actually performed," saying this evidence must be "definite and certain." Therefore, "even given the fact that Galan has failed to maintain adequate records of employment as required under the FLSA," the workers were not entitled to recover from Galan unpaid minimum wages under that Act.

## II.

The timeliness of both the appeal and cross-appeal must first be considered. McLeod's cross appeal asserts that the Texas federal district court lacked personal jurisdiction over the South Carolina company. After the notice of appeal was filed, a post-judgment motion was filed in the district court, and this raises the question whether the notice of appeal was premature.

Rule 4 of the Federal Rules of Appellate Procedure requires the notice of appeal, which is indispensable to appellate jurisdiction, to be filed within thirty days after the date of entry of the judgment appealed from. The filing of a timely motion under Federal Rules of Civil Procedure 52(b)[10] or 59 asking the district court to make additional findings or to alter or amend the judgment, however, suspends the time for filing the notice and the period begins to run only from the date an order is entered granting or denying the motion.[11] Federal

---

7. See 7 U.S.C. § 2043(c); 29 C.F.R. § 40.53(c) (1984); *Mountain Brook Orchards v. Marshall,* 640 F.2d 454, 459 (3d Cir.1981).

8. See 7 U.S.C. § 2050c; 29 C.F.R. § 40.53(a) and (b) (1984).

9. See *supra* notes 7 and 8.

10. The first sentence of Rule 52(b) reads: "Upon motion of a party made not later then 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly."

11. Fed.R.App.P. 4(a)(4); *Gribble v. Harris,* 625 F.2d 1173, 1174 (5th Cir.1980).

Rule of Appellate Procedure 4(a)(4) expressly provides that a notice of appeal filed before the disposition of any of these motions "shall have no effect," and "[a] new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above."

The final judgment in this case was entered on June 8, 1983. Appellant workers filed a timely notice of appeal on July 6 and the appeal was docketed on July 13. On July 16, the appellant workers filed a "Motion to Supplement Pleadings and Judgment," without designating the rule under which it was filed. The motion asked that the judgment and pleadings be supplemented "to clarify that those plaintiffs who are minors are represented by their parents as next friend and that payment of the money judgment to those minor plaintiffs shall be made accordingly."

■ Even were we to treat this as a Rule 59(e) motion to alter or amend the judgment, it was too late because it was not filed within ten days after entry of judgment.[12] The belated motion, filed thirty-six days after entry of the district court's judgment, was therefore absolutely void if characterized as a Rule 59(e) motion. It did not nullify the entry of the district court's June 8 judgment and neither cancelled the notice of appeal filed on July 6 nor extended the time for filing an appeal or cross appeal.[13]

The district court later granted the motion and entered an "Order Supplementing Judgment" on August 26. Appellant workers then filed a second notice of appeal on September 23, reserving their contention that the first notice was effective. This precautionary measure was, however, unnecessary, for the first notice of appeal was valid and unaffected by the appellants' "Motion to Supplement Pleadings and Judgment."

McLeod therefore had fourteen days from the date of the filing of the original July 6 notice of appeal[14] or thirty days from the entry of the district court's June 8 judgment,[15] whichever was later, to file its cross appeal. Its cross-appeal, however, was filed on September 15, and was, therefore, untimely.

■ McLeod protests that the question of the timeliness of the "Motion to Supplement Pleadings and Judgment" was not raised below and that all parties thought that the filing of the motion suspended the time for filing an appeal or cross appeal. Even were this correct, the untimeliness of the Rule 59(e) motion is an unwaivable jurisdictional defect that renders the motion absolutely void.[16]

Whether a motion that is not designated as a Rule 52 or Rule 59 motion should be considered such a motion, whether an unlabelled motion should be considered a Rule 60 motion,[17] and various related issues are

---

12. Fed.R.Civ.P. 59(e).

13. *See Flores v. Procunier,* 745 F.2d 338, 339 (5th Cir.1984); *Gribble v. Harris,* 625 F.2d 1173 (5th Cir.1980); *Albers v. Gant,* 435 F.2d 146, 147 (5th Cir.1970). *See* 9 Moore's Federal Practice § 204.01[4] at 4–10 (2d ed. 1985).

14. Fed.R.App.P. 4(a)(3).

15. Fed.R.App.P. 4(a)(1).

16. *Flores v. Procunier,* 745 F.2d 338 (5th Cir. 1984); Fed.R.Civ.P. 59(e).

17. Rules 60(a) and (b), Federal Rules of Civil Procedure, provide in part:
 (a) Clerical Mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.
 (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepre-

to be considered by this court en banc in two cases, *Harcon Barge Co., Inc. v. D & G Boat Rentals, Inc.*[18] and *Willie v. Continental Oil Co.*[19]

■ Because of the sequence of events here, however, it is unnecessary for us to await the en banc decisions, for it makes no difference to this case whether the "Motion to Supplement Pleadings and Judgment" was a Rule 59(e) motion to alter or amend or a Rule 60 motion. If treated as a Rule 59(e) motion, it was untimely and of no effect. If it was a Rule 60 motion, the cross-appellant is in no better condition, for a Rule 60 motion does not extend the time for filing either an appeal or cross appeal.[20]

Because McLeod's cross appeal was untimely filed, it must be dismissed. The contention it raises, that the district court lacked personal jurisdiction over McLeod, cannot be considered.

■ We note, further, that the district court's "Order Supplementing Judgment," entered after the valid notice of appeal was filed on July 6 and the appeal was docketed on July 13, was invalid no matter how that order is characterized. Treated as an order granting a Rule 59(e) motion to alter or amend, it was invalid for the reasons discussed above. If it is characterized as a Rule 60(a) order correcting clerical mistakes in the judgment, the order, entered after this appeal had been docketed, required leave of this court.[21] Finally, if considered an order under Rule 60(b) to

relieve a party from a final judgment because of mistake or inadvertence, the district court lacked jurisdiction, while the appeal was pending, to grant the Rule 60(b) motion without first obtaining leave of the appellate court.[22]

Because, however, we now remand the case to the district court for further proceedings, the plaintiff-workers should be permitted to refile their motion to clarify the proper method for payment of the judgment. The last part of the decision in *Willie v. Continental Oil Co.*[23] might be read to require that we grant leave to the district court to re-enter its supplemental judgment before we decide the merits. That procedure, however, would needlessly waste time and resources if used in this case because, for reasons given below, we find it necessary to remand this case in any event.

Unlike the "motion to amend" filed in *Willie*, which sought to reduce the amount awarded against a particular defendant to comport with a pretrial stipulation between the parties, the "Motion to Supplement Judgment and Pleadings" filed here did not attack the amount of the judgment or otherwise bear on the liabilities of the parties or the merits of the case. The district court's "Order Supplementing Judgment" sought merely to clarify that the amount awarded to the minor children would be paid to their parents as their next friends. The district court may grant this incidental

---

sentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.

18. 746 F.2d 278 (5th Cir.1984), petition for rehearing en banc granted, 760 F.2d 86 (5th Cir. 1985).

19. 746 F.2d 1041 (5th Cir.1984), rehearing en banc ordered, 760 F.2d 87 (5th Cir.1985).

20. Fed.R.Civ.P. 60(a), (b); *Albers v. Gant*, 435 F.2d 146, 147–48 (5th Cir.1970); *Hardy v. St. Paul Fire and Marine Ins. Co.*, 599 F.2d 628, 629 (5th Cir.1979); *Silas v. Sears, Roebuck and Co.*, 586 F.2d 382, 386 (5th Cir.1978).

21. Fed.R.Civ.P. 60(a).

22. *Lairsey v. Advance Abrasives Co.*, 542 F.2d 928, 932 (5th Cir.1976); *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697, 698–99 (5th Cir.1955).

23. 746 F.2d 1041, 1046 (5th Cir.1984).

relief on remand after we decide this appeal.

### III.

"This court has repeatedly held that the ultimate conclusion that an individual is an 'employee' within the meaning of the [Fair Labor Standards Act] is a legal determination rather than a factual one."[24] McLeod correctly points out that, while this rule has been stated repeatedly, we have not always followed it.[25] Thus, in *Hodgson v. Griffin and Brand of McAllen, Inc.*,[26] we said, quoting *Wirtz v. Lone Star Steel Company:*[27] "Whether a person or corporation is an employer or joint employer is essentially a question of fact," and we held the conclusion subject to review under the clearly erroneous standard, affirming the district court's judgment. Similarly, in *Donovan v. Sabine Irrigation Co., Inc.*, we said the issue is "essentially a question of fact."[28] Even Homer nods, however, and both the weight of our decisions and the weight of authority in other circuits[29] support the characterization as one of law, while, of course, subsidiary findings are of fact.

■ The Supreme Court held almost four decades ago that the determination of employee status under the Fair Labor Standards Act is not controlled by the traditional criteria used at common law to determine whether a person is an employee.[30] The concept of "employee" under that Act must instead be broadened to include those "whose livelihood is dependent upon finding employment in the business of others."[31]

■ In deciding whether migrant farm laborers employed to "chop," *i.e.* to weed, cotton were employees of the farmer on whose farm they worked, or of the labor contractor who recruited them, or of both, we observed in *Castillo v. Givens*[32] that, if the alleged contractor were held to be an employee of the farmer, it would necessarily follow that the workers were in turn the farmer's employees. But even if the recruiter were held to be an independent contractor, the Fair Labor Standards Act might require the conclusion that the recruiter-contractor and the farmer were joint employers of the workers. In making these determinations, we examine the economic realities of the relationship among the workers, the contractor, and the farmer. "Employees are those who as a matter of economic reality are dependent upon the business to which they render service."[33] We consider the totality of the relationships involved. It is not essential that the farmer have control over all aspects of the work of the laborers or the contractor. The factors "critically significant" are "(1) how specialized the nature of the work is, and (2) whether the individual [the 'contractor' alleged to be sufficiently independent

---

**24.** *Castillo v. Givens*, 704 F.2d 181, 185 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir.1983); *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 271 (5th Cir.1982); *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 n. 4 (5th Cir.1981); *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 n. 11 (5th Cir.1979); *Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir.1970).

**25.** *See Castillo, id.*, 704 F.2d at 187 n. 12.

**26.** 471 F.2d 235, 237 (5th Cir.1973).

**27.** 405 F.2d 668, 669 (5th Cir.1968).

**28.** 695 F.2d 190, 194 (5th Cir.1983).

**29.** *See, e.g., Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir.1984); *Bonnette v. California*

*Health and Welfare Agency*, 704 F.2d 1465, 1468–69 (9th Cir.1983); *Donovan v. Trans World Airlines, Inc.*, 726 F.2d 415 (8th Cir.1984).

**30.** *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947); *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir.1976).

**31.** *Fahs v. Tree-Gold Coop Growers of Florida*, 166 F.2d 40, 44 (5th Cir.1948) (applying same criteria under Social Security Act), citing Supreme Court decisions, *id.*

**32.** 704 F.2d 181 (5th Cir.1983).

**33.** *Castillo v. Givens, supra*, n. 24, 704 F.2d at 189, *quoting Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947, 1953 (1947).

to be the employer] is 'in business for himself.' " [34]

■ Galan, and therefore the laborers, were, under these principles, employees of McLeod. Here, as in *Castillo,* "the record unquestionably demonstrates the rote [not the specialized] nature" of the work performed on the McLeod farm.[35] Picking vegetables involves one piece of equipment, a bucket, and one task, plucking the size and color vegetable the worker has been told to pick and putting it in the bucket. "It is such a simple task that even children can do it" [36]—and here did. The vegetable harvesting was merely a phase of the normal operation of McLeod's vegetable farming and shipping business, part of "an integrated economic unit." [37] The work is recurring and relatively permanent, although seasonal. Members of another crew doing exactly the same work were regularly engaged as employees. Mac McLeod provided overall supervision although Galan provided routine supervision of the kind commonly given by foremen, serving in many instances merely to communicate Mac McLeod's instructions to the workers. Galan's tasks required little or no specialized skill.[38]

Applying the second critical factor, the independence of the contractor, Galan can hardly be said to have been in business for himself. He had no capital. While he owned a truck (which broke down en route) and a van, he lacked the money to transport himself or the crew to South Carolina. He could not even supply the simple buckets used in picking. Such employment records as were kept were kept by McLeod. "Any decisions involving judgment, initiative, or basic control were made by" [39]

McLeod and the farmer furnished all investment or risk capital. Galan had little or no control over the manner in which the harvest work proceeded. Mac McLeod controlled the important details of performance, including when the crews would work, what fields and crops to pick and when, the size produce to pick, and other details. He retained authority to order the firing of individual crew members.

Galan had no separate business organization and no regular crew. He recruited the workers in the crew specifically to work on the McLeod farm. He had worked on the McLeod farm for four consecutive years and had come to depend upon that relationship.[40]

Of course, Galan could and did make a profit out of the work of his crew. But this was not based on risk of loss of any capital investment or his entrepreneurial skill but was simply a piece-rate override, measured by the difference between the total amount McLeod paid for each bin and the amount paid pickers for the buckets. As in *Usery v. Pilgrim Equipment Co., Inc.,*[41] the "major determinants" of Galan's profit "were directly controlled by" the farmer.[42] McLeod unilaterally determined the amount paid per bin of produce picked and to some degree controlled the amount paid per bucket to individual workers. McLeod determined the days the laborers worked and the success of its farming operation determined the size of the crop to be picked. These and other factors, within the farmer's control, influenced Galan's profit or loss more directly than did the productivity of the crew he supervised.[43]

There are factual differences between the Galan-McLeod relationship and that in

---

**34.** *Castillo v. Givens, id.,* 704 F.2d at 190, and cases cited therein.

**35.** *Id.,* 704 F.2d at 191.

**36.** *Id.*

**37.** *Id., quoting Rutherford Food Corp. v. McComb,* 331 U.S. 722, 726, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772, 1776 (1947).

**38.** *Castillo, id.,* 704 F.2d at 191.

**39.** *Id.,* 704 F.2d at 192.

**40.** *Id.,* 704 F.2d at 192. *See Fahs v. Tree-Gold Coop. Growers of Florida,* 166 F.2d 40, 44 (5th Cir.1948).

**41.** 527 F.2d 1308, 1313 (5th Cir.1976).

**42.** *Id.*

**43.** *See Castillo, supra* n. 24, 704 F.2d at 190.

*Castillo:* the contractor in *Castillo* did not go out to recruit the workers but waited for them to seek him; the contractor himself was a field worker and was paid on an hourly basis; Galan did recruit workers for other seasonal employment while the *Castillo* contractor apparently did not. These differences are, however, insignificant. That Galan directed his crew to work for one or two other growers in South Carolina after they worked for McLeod is also not determinative. He did so only when McLeod had no work and with McLeod's express or implied permission. An employee may, of course, work for different employers at different times and still be an employee of each. While Galan was not a field worker, he was, as we have pointed out, no more than a foreman.

Facts are infinitely variable and the dissimilarity of certain facts does not always require different results. The principles governing employer status established in prior cases turn on economic reality, not contractual niceties. The economic reality of the entire situation shows that both the contractor and the laborers were dependent upon the farm owner's business.[44] *Castillo,* therefore, cannot be distinguished on the bases stated any more than it can be distinguished because it involved chopping cotton rather than picking vegetables.

*Castillo,* moreover, does not stand alone. The same criteria were applied by this circuit in *Hodgson v. Griffin and Brand of McAllen, Inc.*[45] in affirming a district court decision that a farm enterprise similar to McLeod's, which used a labor contractor to recruit workers, was an employer or joint employer of the harvest crews under the Fair Labor Standards Act.[46] Applying these tests in *Usery v. Pilgrim Equipment Co., Inc.,*[47] we affirmed a district court holding that a laundry was the employer of women who operated its pickup stations. Using the same criteria in *Fahs v. Tree-Gold Coop Growers of Florida,*[48] we reversed the district court and held that, for purposes of the Social Security Act, fruit packers, denominated "contractors," were employees of the packing house that had engaged them.

An interpretive bulletin issued by the Administrator of the Wage-Hour Division of the United States Department of Labor states criteria for determining whether a labor contractor is an employer of the workers he supplies.[49] That bulletin provides that "[w]hether or not a labor contractor or crew leader is found to be a bona fide independent contractor, his employees are considered jointly employed by [the labor contractor] and the farmer ... if the

44. *See Castillo, supra* n. 24, 704 F.2d at 192; *Usery, supra* n. 41, 527 F.2d at 1311.

45. 471 F.2d 235 (5th Cir.1973).

46. *See also Hodgson v. Okada,* 472 F.2d 965 (10th Cir.1973); *Mitchell v. Hertzke,* 234 F.2d 183 (10th Cir.1956).

47. 527 F.2d 1308 (5th Cir.1976).

48. 166 F.2d 40 (5th Cir.1948).

49. 29 C.F.R. § 780.331 (1984) reads in part as follows:

(a) Whether a crew leader or a labor contractor is the employer of the workers he supplies is a question of fact.... A crew leader who merely assembles a crew and brings them to the farm to be supervised and paid directly by the farmer, and who does the same work and receives the same pay as the crew members is an employee of the farmer, and both he and his crew are counted as such and paid accord-

ingly.... The situation is not significantly different if under the same circumstances, the crew is hired at so much per acre for their work. This is in effect a group piecework arrangement.
(b) The situation is different where the farmer only establishes the general manner for the work to be done. Where this is the case, the labor contractor is the employer of the workers if he makes the day-to-day decisions regarding the work and has an opportunity for profit or loss through his supervision of the crew and its output. As the employer, he has the authority to hire and fire the workers and direct them while working in the fields. Complaints by the farmer about the quality or quantity of the work or about a worker are made to the contractor or his representatives, who takes whatever action he deems appropriate. His opportunity for profit or loss comes from his control over the time and manner of performance of work by his crew and his authority to determine the wage rates paid to his workers.

farmer has the power to direct, control or supervise the work, or to determine the pay rates or method of payment," citing *Hodgson v. Okada* and *Hodgson v. Griffin & Brand,* cases we have already cited. The issue here is not whether Galan was liable as the workers' employer but whether McLeod was. As discussed above, McLeod exercised control and supervision over the work performed and determined, by setting the amount paid per bin and per bucket of produce, the amounts paid to the crewmembers.

We hold, therefore, that McLeod was an employer of the workers for Fair Labor Standards Act purposes and had the duty to pay the laborers a minimum wage.

### IV.

The district court also held that the workers had failed to meet what it called their burden of establishing, by a preponderance of definite and certain evidence, the number of hours worked by the individual plaintiffs and the amount of wages due them.

The court did not reject the workers' testimony that at least some of them worked eight to nine hours per day for five to six days each week. Indeed, save as to the Beliz family, the testimony was that all of the adults in the crew and at least some of the children worked the same hours. It is obvious that the district court credited this testimony because it found that "[a]t least some members of the crew [worked] eight to nine hours per day for five to six days each week they were on W.H. McLeod & Sons' farm"; the workers' testimony as to their own hours of work was the only evidence before the court regarding the number of hours worked each week by the crew as a group. The ruling denying the workers recovery was instead based on the workers' inability to produce the "definite and certain" evidence thought necessary by the district court and their inability to "establish the hours or days worked by *individual* plaintiffs." [50] In each respect the district court "was laboring [under] a misconception of the legal standard to be followed." [51]

When an employer has failed to maintain the payroll records required by the Act, the employees' initial burden is to make out a prima facie case that the Act has been violated and to produce some evidence to show the amount and extent of the violation. [52] The workers meet their burden if they produce "sufficient evidence to show the amount and extent of [their] work as a matter of just and reasonable inference." [53] The burden then shifts to the employer to "disprove the employee's testimony that the Act was violated." [54] The employer must come forward with "evidence to negative the reasonableness of the inference to be drawn from the employees' evidence." [55] If an employee makes a credible showing that he has performed work not properly compensated, "the employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of" the Act. [56] Because precise evidence of the hours worked by each individual is not available due to the failure of both Galan and McLeod to keep adequate records, the workers may satisfy their bur-

**50.** Emphasis added.

**51.** *Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721, 725 (5th Cir.1961).

**52.** *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515, 1522 (1946); *Williams v. Tri-County Growers, Inc.,* 747 F.2d 121, 128 (3d Cir.1984).

**53.** *Anderson v. Mt. Clemens Pottery Co., id.,* quoted in *Castillo, supra* n. 24, 704 F.2d at 194.

**54.** *Skipper v. Superior Dairies, Inc.,* 512 F.2d 409, 420 (5th Cir.1975); *Shultz v. Hinojosa,* 432 F.2d 259, 261 (5th Cir.1970).

**55.** *Anderson v. Mt. Clemens Pottery Co., supra* n. 52, quoted in *Castillo, supra* n. 24, 704 F.2d at 194.

**56.** *Donovan v. Grantham,* 690 F.2d 453, 458 (5th Cir.1982), *quoting Anderson v. Mt. Clemens Pottery Co., id.*

den with admittedly inexact or approximate evidence.[57]

The workers in this case made out just such a prima facie case. They established the amounts they were actually paid by introducing McLeod's payroll records, which, although otherwise incomplete, do at least show the gross wages paid to each family group. For a work week of eight to nine hours a day, five to six days a week, the wages actually paid show an apparently egregious minimum wage violation for every worker in the crew. Therefore, the only inexactness that could be found in the plaintiffs' case lay in the evidence concerning the hours worked by each member of each family unit.

 Three plaintiff witnesses testified about the hours they, their spouses and children, and other families worked. "[I]t is clear that each employee need not testify in order to make out a prima facie case of the number of hours worked as a matter of just and reasonable inference."[58] Testimony of some employees concerning the hours worked by groups of non-testifying employees is sufficient if those who do testify have personal knowledge of the work performed by those who do not.[59] In the *Castillo* case, for example, a prima facie case was established by testimony of some plaintiffs regarding the hours they and members of their families worked.[60] The plaintiffs offered similar evidence in this case. The district court, therefore, erred in concluding that this evidence was not sufficient to show the hours worked by *any* of the individual workers.

Of course, we cannot and do not make any findings concerning how many persons in each family group actually worked or how many hours per day or days per week each person worked. We hold, however, that the evidence was sufficient to establish, by reasonable inference, the hours worked by some members of each family. We therefore remand the case and direct the district court to re-examine the evidence, applying the principles discussed above, and calculate the amounts due each plaintiff found entitled to back pay.

V.

The Farm Labor Contractor Registration Act[61] (referred to in this part of the opinion only as the Act) was adopted to prevent "irresponsible contractors" from exploiting both the producers of agricultural products and migrant agricultural workers.[62] It requires the registration of farm labor contractors, imposes a number of obligations upon both contractors and those who engage them, and prohibits certain practices by contractors and farmers.[63] The Act and regulations adopted pursuant to it require any person who is furnished any migrant worker by a farm labor contractor to (a) maintain all payroll records required under federal law; (b) obtain from the contractor and maintain records showing for each worker total earnings in each payroll period, withholdings from wages, net earnings, hours worked, and other payroll data;[64] and (c) determine before engaging the services of the contractor that the contractor has a certificate of registration in full force

57. *Reeves v. International Tel. and Tel. Corp.,* 616 F.2d 1342, 1351 (5th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); *Marshall v. Mammas Fried Chicken,* 590 F.2d 598, 599 (5th Cir.1979).

58. *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 472 (11th Cir.1982); *Brennan v. General Motors Acceptance Corporation,* 482 F.2d 825 (5th Cir.1973).

59. *Donovan v. Hamm's Drive Inn,* 661 F.2d 316 (5th Cir.1981); *Brennan v. General Motors Acceptance Corporation,* 482 F.2d 825 (5th Cir.

1973); *Hodgson v. Okada,* 472 F.2d 965, 969 (10th Cir.1973).

60. *Supra* n. 24, 704 F.2d at 195.

61. 7 U.S.C. §§ 2041 *et seq.*

62. *Id.*

63. 7 U.S.C. §§ 2043, 2044, 2045, 2050b, 2050c; 29 C.F.R. §§ 40.1 *et seq.* (1984).

64. 7 U.S.C. § 2050c, 2045(e); 29 C.F.R. § 40.-51(k), (*l*), § 40.53 (1984).

**1332**

that authorizes the contractor's various activities.[65]

While Galan had a labor contractor registration certificate, the certificate showed on its face that he was not authorized to transport or house workers. The district court found that McLeod failed to ascertain that Galan was properly registered under the Act for the activities he undertook and failed to obtain from Galan or to maintain the payroll records required by the Act, thereby intentionally violating the Act. It awarded each plaintiff $200 from McLeod on the basis that this amount would "fairly and equitably compensate him or her for each of [McLeod's] statutory violations." The workers contest the adequacy of the award, contending that it is based on a purely compensatory standard that fails to effectuate the remedial purpose of the Act.

The Act grants a cause of action for its violation and permits an award of "up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief."[66] A district court has discretion to fix the amount of the award and it may allow a successful plaintiff less than $500.[67]

The legislative history of the Act and the decisions interpreting it make clear that the purpose of this civil remedy is not restricted to compensation of individual plaintiffs. It is designed also to promote enforcement of the Act and thereby deter and correct the exploitive practices that have historically plagued the migrant farm labor market.[68]

Deterrent effect may be achieved without awarding exemplary damages. Whether an award accomplishes this purpose, in addition to affording compensation, is determined by considering not only the amount allowed to each plaintiff for each violation but also the total amount of the award, the nature and persistence of the violations,[69] the extent of the defendant's culpability,[70] damage awards in similar cases, the defendant's ability to prevent future violations of the Act,[71] the substantive or technical nature of the violations,[72] and the circumstances of each case. Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements. Nor should a worker who sues for violations find recovery inadequate to cover his personal costs in filing suit, testifying, and paying attendant attorney's fees, recovery of which is not allowed by the Act. Further, the legislative history of the Act notes that farm workers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations.[73] Awards

**65.** 7 U.S.C. § 2043(c); 29 C.F.R. § 40.53(c) (1984).

**66.** 7 U.S.C. § 2050a(b).

**67.** *Castillo, supra* n. 24, 704 F.2d at 197 n. 37; *De La Fuente v. Stokely-Van Camp, Inc.,* 514 F.Supp. 68, 79–80 (C.D.Ill.1981), *aff'd,* 713 F.2d 225, 239 (7th Cir.1983).

**68.** S.Rep. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6441; *Alvarez v. Longboy,* 697 F.2d 1333, 1339 (9th Cir.1983); *Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir.1981); *Mountain Brook Orchards v. Marshall,* 640 F.2d 454, 457 (3d Cir. 1981).

**69.** *Compare Washington v. Miller,* 721 F.2d 797, 803 (11th Cir.1983) *with Alvarez v. Longboy,* 697 F.2d 1333, 1338 (9th Cir.1983) *and Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1223–24 (7th Cir.1981).

**70.** *Compare Alvarez v. Joan of Arc, Inc., id.,* 658 F.2d at 1224 *with Washington v. Miller, id.,* 721 F.2d at 803.

**71.** *Rivera v. Adams Packing Ass'n, Inc.,* 707 F.2d 1278, 1281–82 (11th Cir.1983); *Mountain Brook Orchards v. Marshall, supra* n. 68, 640 F.2d at 457–59.

**72.** *Compare Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1224 (7th Cir.1981) *with Washington v. Miller,* 721 F.2d 797, 803 (11th Cir.1983).

**73.** *See* FLCRA Amendments of 1973: Hearings on H.R. 7597 Before The Subcommittee On Agricultural Labor Of The Committee On Education And Labor, 93d Cong. 1st Sess., (1973), at pp. 166, 171, 173; *Flores v. Fulwood Farms of Florida, Inc.,* 450 F.Supp. 1046 (M.D.Fla.1978); *S.P. Growers Ass'n v. Rodriguez,* 17 Cal.3d 719, 552 P.2d 721, 131 Cal.Rptr. 761 (1976).

should be adequate to encourage workers to assert their statutory rights.

The courts have articulated no systematic criteria to guide the exercise of a trial court's discretion in fixing the amount of damages, but this is an almost inevitable result of imparting discretion. The damages district courts have fixed per violation have varied widely. Thus, the Eleventh Circuit has affirmed an award against a grower of $500 for each of two violations [74] and an award against a contractor of $500 for each of five violations.[75] The Ninth Circuit has affirmed an award against a contractor of $150 in favor of each of 92 workers [76] and the Seventh Circuit has affirmed an award of $100 in favor of each of 300 workers for a single violation.[77]

■ In fixing damages the court may consider the factors we have mentioned and the total number of plaintiffs involved, the total number of violations, and the total amount that will be exacted from the delinquent defendant. The court may also consider the plaintiffs' recovery on closely related claims joined in the same suit that will in part compensate the damages caused by violations of the Act. Beyond stating the criteria, we are unable to set more precise guidelines and we lack the power to set a metered rate per violation. Rigid rules would deny the district court the discretion the statute imparts. The purpose of the Act might be effectuated in one case by allowing only actual damages if there are many plaintiffs and the total award is great, and it might not be achieved in another case even by allowing the $500 maximum to a single plaintiff whose actual damages have been nominal.

■ In this case, the plaintiffs joined claims, on which they have now prevailed, under the Fair Labor Standards Act and against Galan. While the Act and the Fair Labor Standards Act have different purposes, the record-keeping provisions of the

Act incorporate the Fair Labor Standards Act requirements. Moreover, the record-keeping requirements of the Act are designed in part to prevent minimum wage violations and other departures from the Fair Labor Standards Act. Awarding the workers recovery of unpaid wages will thus compensate them for at least some of the damages resulting from the record keeping violations. Because we remand this case to the district court for the award of minimum wages and possible overtime pay to the workers, we consider the effect of our entire judgment. Taking all of the matters we have discussed into account, we do not consider the judgment against McLeod for violations of the Act an abuse of discretion, although we might consider an award of $200 per plaintiff, for a total of $3,200, standing alone, manifestly inadequate.

## VI.

■ The district court held that Galan committed ten distinct intentional violations of the Act and assessed damages against him for those, $500 for each worker. The workers also appeal the amount of this award but their principal effort is to hold McLeod jointly liable for Galan's violations on the basis that Galan was acting as McLeod's agent, making McLeod vicariously liable for his debts. For the reasons set forth above, we do not consider the amount of the award against Galan so niggardly as to constitute an abuse of discretion, and we turn to the argument that McLeod should be held liable jointly with Galan for the contractor's violations of the Act.

■ Although the parties dwell on whether, by Texas standards, Galan was or was not an "agent" of McLeod, his classification in that fashion would not be dispositive. The question is whether the Farm Labor Contractor Registration Act visits vicarious liability on a farmer who engages a registered labor contractor to recruit and

**74.** *Rivera v. Adams Packing Ass'n., Inc.,* 707 F.2d 1278 (11th Cir.1983).

**75.** *Washington v. Miller,* 721 F.2d 797 (11th Cir. 1983).

**76.** *Alvarez v. Longboy, supra* n. 68, 697 F.2d at 1340.

**77.** *Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217 (7th Cir.1981).

provide labor. The statute appears to us to preclude such an imposition.

When the Act was adopted in 1963, it regulated only farm labor contractors. It was amended in 1974 to impose specific responsibilities on those who engage farm labor contractors.[78]

In those instances in which Congress thought the person who is furnished the services of a migrant worker should be liable for the contractor's derelictions, it specifically imposed such liability. Thus, it requires "any person who is furnished any migrant worker by a farm labor contractor" to maintain payroll records and to "obtain from the contractor and maintain records containing the information" that the Act requires the contractor to provide to the farmer.[79] The Act imposes liability upon the farmer who fails to ensure that the contractor is properly registered to perform the services for which he is engaged.[80] And it forbids "any person" to discriminate against any migrant worker who has taken action to enforce the Act.[81]

The provisions of the Act, however, otherwise carefully distinguish between the liabilities of the contractor and the person who is furnished migrant labor. They negate the imposition of vicarious liability on the farmer in the very common situation in which the contractor is his agent, for vicarious liability would defeat the Act's division of responsibility between these parties. Indeed it is hard to conjecture any circumstance in which the contractor would not be the "agent," for at least some purposes, of a farmer who communicated with him in advance to request that he recruit labor.

The district court did not err, therefore, in refusing to hold McLeod vicariously liable for Galan's violations of the Act.

## VII.

For these reasons, judgment is rendered as follows:

A. That part of the district court judgment holding that McLeod was not the employer of the plaintiff-workers and that the workers did not prove the number of hours worked is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

B. That part of the district court judgment awarding damages against McLeod for its violations of the Farm Labor Contractor Registration Act is AFFIRMED.

C. That part of the district court judgment awarding damages against Galan for his violations of the Farm Labor Contractor Registration Act is AFFIRMED.

D. That part of the district court judgment holding McLeod not liable for Galan's violations of the Farm Labor Contractor Registration Act is AFFIRMED.

E. McLeod's cross-appeal is DISMISSED.

**78.** S.Rep. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6441, 6443.

**79.** 7 U.S.C. § 2050c, and, by its specific reference, 7 U.S.C. § 2045(e).

**80.** *See supra* n. 7.

**81.** 7 U.S.C. § 2050b.