# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2011

No. 10-20424

Lyle W. Cayce
Clerk

ALVARO ALBANIL, ET AL.

Plaintiffs-Appellants

v.

COAST 2 COAST, INC. AND JEFFREY WAYNE TAYLOR

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-00486

Before JOLLY and HAYNES, Circuit Judges, and RODRIGUEZ, District Judge.[*][1]

RODRIGUEZ, District Judge.

Plaintiffs-Appellants appeal the district court's grant of summary judgment on their Fair Labor Standards Act ("FLSA") claims. Appellants are forty-one individuals employed by Appellee Coast 2 Coast, Inc. ("C2C"). They travel around the country in C2C's "rigs," which consist of a pickup truck and trailer with an attached compressor, to various job sites, where they remove

---

[*] Pursuant to Fifth Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

[1] District Judge of the Western District of Texas, sitting by designation.

No. 10-20424

hardened concrete from the insides of concrete mixer drums and other enclosed spaces. Appellants sued C2C for alleged violations of the FLSA's minimum-wage and overtime requirements.

The first issue on appeal is whether the Motor Carrier Act ("MCA") exemption to the FLSA's overtime requirements applies. Appellants challenge the district court's conclusion that it does. This issue involves determining whether C2C operated "commercial motor vehicles" during the relevant time period. A "commercial motor vehicle" is defined by statute as a "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater" or meets certain other criteria not relevant here. The parties dispute whether the weight of the pickup truck and the trailer may be combined to reach the 10,001 pound threshold, as stated in a Department of Transportation regulation, or whether the use of the disjunctive "or" in the statutory definition requires them to be considered separately. We hold that the district court correctly combined the weights of the pickup and trailer to conclude that the MCA exemption applies, and that summary judgment was appropriate on Plaintiffs' overtime claims.

The other issue on appeal is whether the district court committed harmful error in granting summary judgment *sua sponte* in favor of Defendants on certain Plaintiffs' minimum wage claims. We hold that the district court erred by granting *sua sponte* summary judgment without sufficient notice, and that the error was harmful because Plaintiffs' evidence raises a material fact issue concerning liability. Accordingly, the district court's grant of summary judgment on certain Plaintiffs' minimum wage claims is reversed, and this case is remanded for further proceedings consistent with this opinion.

No. 10-20424

## I.

### A. Factual Background

The facts of this case are largely undisputed. Defendant C2C provides concrete chipping services to customers in a number of states, and its employees travel to customer sites in company rigs to perform chipping services. Plaintiffs are current and former employees of C2C. Most are or were employed as "chippers," who removed hardened concrete from the inside of mixer drums and other enclosed spaces. Two are or were employed as foremen, who were primarily responsible for driving C2C's rigs and who supervised the chippers' work.[2] Plaintiffs reside in Harris County, Texas. They report to C2C's office in Pasadena, Texas, and then load their equipment onto C2C's rig. They depart from Pasadena to job sites around the country, traveling in the rig, and then return to Pasadena after several weeks. They are paid, on an hourly basis, only for the time between their arrival at and departure from a job site.

### B. Procedural Background

On February 11, 2008, Plaintiffs filed this collective action under the FLSA, 29 U.S.C. §§ 206-207, 215, against C2C and its President, Jeffrey Taylor. Plaintiffs asserted claims under the FLSA for failure to pay minimum and overtime wages, as well as a claim for illegal deductions in violation of Texas Labor Code § 415.006 (by collecting a premium or fee for workers' compensation insurance).[3] The parties filed a stipulation that all Plaintiffs are and were employees of Defendants under the FLSA and Chapter 415 of the Texas Labor

---

[2] This is a consolidated action. Fifteen Plaintiffs employed by C2C as chippers filed their Original Complaint in 08-CV-486, and two Plaintiffs (Abel Ramirez and Martin Rivas) employed as foremen filed their Original Complaint in 08-CV-487. Approximately twenty-four additional chippers joined by filing consents pursuant to 29 U.S.C. § 216(b).

[3] Section 415.006 of the Texas Labor Code provides that "[a]n employer may not collect from an employee, directly or indirectly, a premium or other fee paid by the employer to obtain workers' compensation insurance coverage, except as provided by Sections 406.123 and 406.144."

No. 10-20424

Code during the relevant times, were not independent contractors, and that C2C was and is Plaintiffs' employer. On November 17, 2008, the district court granted Plaintiffs' motion to certify a class of chippers. The class consists of "all current and former hourly-paid workers who worked for Coast 2 Coast, Inc., performing concrete removal work, between June 16, 2005, and the present."

On August 3, 2009, the parties filed cross-motions for partial summary judgment on the issue of whether the MCA exemption applies to Plaintiffs' overtime claims. Plaintiffs also filed a second motion for partial summary judgment on specific issues related to their minimum-wage and Texas Labor Code claims.

On March 31, 2010, the district court issued an order granting Defendants' motion for partial summary judgment on the MCA exemption and denying Plaintiffs' motions for partial summary judgment. The district court concluded that the term "commercial motor vehicle" should be given its "current meaning" under the existing DOT regulations, which contemplate a combined gross weight, and thus the weight of the pickup trucks and the loaded trailers could be combined in determining whether Defendants' rigs met the weight requirement. Considering the summary judgment evidence, the district court found that Defendants' rigs met the weight requirement and that the chippers qualified as drivers' helpers, and were thus exempt. Accordingly, the district court concluded that Defendants had shown the applicability of the MCA exemption as a matter of law.

Although Defendants did not file a motion for summary judgment on the issue of liability on Plaintiffs' FLSA minimum-wage claims, the district court granted summary judgment in favor of Defendants. The district court found that Defendants had asked the court to deny the claims as a matter of law in their response to Plaintiffs' motion, and that sufficient opportunity was afforded both sides to brief the matter. The district court stated that, even if it were to

agree with Plaintiffs that they should have been compensated for some of the activities they performed, "this would not be enough to show a minimum wage violation – the violation occurs only if the total hours worked divided by the pay is less than minimum wage." Because the Plaintiffs had not offered evidence to show that their total hours worked divided by their pay was less than the minimum wage, the district court found that they had not met their initial burden on the minimum-wage violations and that summary judgment for Defendants was warranted. The district court also found that it lacked jurisdiction over Plaintiffs' Texas Labor Code claims because they did not request an administrative hearing. That same day, the district court issued a final take-nothing judgment.[4]

Plaintiffs timely filed a Motion to Alter or Amend the Judgment, challenging only the district court's summary judgment on their FLSA minimum-wage claims. Plaintiffs noted that Defendants did not move for summary judgment on the minimum-wage claims, and argued that the district court's grant of summary judgment was both without notice and harmful because Plaintiffs could adduce evidence in support of those claims, which they submitted with the motion. After the district court denied the motion, Plaintiffs timely filed this appeal.

---

[4] Within its Memorandum Opinion and Order, the district court concluded that it lacked jurisdiction over the Texas Labor Code claim and stated that Plaintiffs' "claims for the workers' compensation deduction under the Texas Labor Code are dismissed for lack of subject matter jurisdiction." However, in its conclusion, the district court failed to note the dismissal of the Texas Labor Code claim for want of jurisdiction, and instead granted summary judgment on all of Plaintiffs' claims. Further, the district court's final judgment states that "[j]udgment is entered for the defendant on all of the plaintiff's [sic] claims, and plaintiff [sic] shall take nothing." No Plaintiffs challenge the district court's disposition of the Texas Labor Code claims.

No. 10-20424

## II.

All Plaintiffs appeal the district court's grant of summary judgment on their overtime claims, arguing that the district court misconstrued the MCA exemption to the FLSA's overtime requirements. All but six of the Plaintiffs challenge the district court's *sua sponte* grant of summary judgment on the minimum wage claims.[5] We have jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment.

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*, 600 F.3d 511, 513 (5th Cir. 2010). Summary judgment is appropriate where the submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The granting of *sua sponte* summary judgment without notice is subject to harmless error review. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994). Failure to provide proper notice is harmless error "if the nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact." *Id*.

## A.

In their first issue on appeal, Plaintiffs assert that the district court erroneously concluded that the MCA exemption applies to their overtime claims because C2C is not a motor private carrier.

---

[5] Four chippers and the two foremen – Pedro Buendia, Gerardo Ramirez, Hector Albanil, Martin Albanil, Abel Ramirez, and Martin Rivas – state that they are not appealing the summary judgment on the minimum-wage claims because their wages exceeded the minimum wage even when their alleged uncompensated time is considered.

No. 10-20424

Section 207 of the FLSA mandates that workers receive overtime pay, subject to certain exemptions. One such exemption is the MCA exemption, found in section 213(b)(1) of the FLSA. Section 213(b)(1) provides that "[t]he provisions of section 207 of this title shall not apply with respect to– (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [of the MCA]." 29 U.S.C. § 213(b)(1).

According to the Department of Labor ("DOL") regulations enforcing the FLSA, the application of the MCA exemption to an employee "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." *Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (quoting 29 C.F.R. § 782.2(a)). The DOL regulations provide that "[t]he power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act . . ., and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a).[6] Though both of these requirements were in dispute in the district court, on appeal Plaintiffs challenge only whether C2C is a motor private carrier subject to the Secretary of Transportation's jurisdiction. Further, due to further concessions by Plaintiffs on appeal, resolution of this issue depends only

---

[6] "The Secretary . . . need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [MCA] exemption to apply. " *Songer*, 618 F.3d at 472 (quoting *Barefoot v. Mid-America Dairymen, Inc.*, No. 93-1684, 1994 WL 57686, at *2 (5th Cir. Feb.18, 1994) (per curiam) (citing *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678 (1947))).

No. 10-20424

on whether the weight of the pickup truck and the trailer can be combined to determine whether C2C's "rig" is a commercial motor vehicle. In making this determination, the Court turns to the statute and applicable regulations.

Though the language of section 213(b)(1) did not change during the time period relevant to this litigation, the scope of the Secretary of Transportation's authority (and thus the scope of the MCA exemption under § 213(b)(1)) was amended during that time. Section 31502 provides that "[t]he Secretary of Transportation may prescribe requirements for– (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a *motor carrier*; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a *motor private carrier*, when needed to promote safety of operation." 49 U.S.C. § 31502(b) (emphasis added). The terms "motor carrier"and "motor private carrier" have the same meanings given those terms in section 13102. 49 U.S.C. § 31501(2).

Before August 10, 2005 (and, as will be discussed, after June 6, 2008), section 13102 defined "motor carrier" as "a person providing *motor vehicle* transportation for compensation" and "motor private carrier" as "a person, other than a motor carrier, transporting property by *motor vehicle* when– (A) the transportation is as provided in section 13501 of this title; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(14), (15). The term "motor vehicle" means "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from a fixed overhead wire, and providing local passenger transportation similar to street-railway service." 49 U.S.C. § 13102(16). Thus, before August 10, 2005,

the MCA gave the Secretary of Transportation regulatory authority over motor carriers and motor private carriers utilizing certain motor vehicles in interstate commerce, regardless of the vehicle's weight. As a result, many employees fell within the MCA exemption to the FLSA, and employers were not required to pay them overtime compensation.

On August 10, 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") went into effect. Pub. L. No. 109-59, 119 Stat. 1144. Section 4142 of SAFETEA-LU changed the definitions of "motor carrier" and "private motor carrier" in section 13102 by replacing the term "motor vehicle" with "commercial motor vehicle (as defined in [49 U.S.C.] section 31132)" in each definition.[7] Section 31132 states that "(1) 'commercial motor vehicle' means a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle-- (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater[8]; (B) is designed or used to transport more than 8 passengers (including the driver) for compensation; (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or (D) is used in transporting [hazardous] material . . . ." 49 U.S.C. § 31132. Thus, this amendment restricted the Secretary's regulatory authority – and thereby also narrowed the MCA exemption to the FLSA's overtime requirements – to only those motor carriers

---

[7] Pub. L. No. 109-59, § 4142(a), 119 Stat. 1144, 1747 ("DEFINITIONS RELATING TO MOTOR CARRIERS.—Paragraphs (6), (7), (12), and (13) of section 13102 of title 49, United States Code, are each amended by striking 'motor vehicle' and inserting 'commercial motor vehicle (as defined in section 31132)'.").

[8] This has been the definition of "commercial motor vehicle" since 1998. The language "or gross vehicle weight" and "whichever is greater" was added in June 1998 as part of the Transportation Equity Act for the 21st Century ("TEA-21"), a 500-page "[a]ct to authorize funds for Federal-aid highways, highway safety programs, and transit programs, and for other purposes." *See* Pub. L. No. 105-178, 112 Stat. 107, 404, § 4008(a).

and private motor carriers who operated "commercial motor vehicles (as defined in section 31132)."

On June 6, 2008, Congress passed the SAFETEA–LU Technical Corrections Act ("TCA"). Pub. L. No. 110-244, 122 Stat. 1572. Section 305 of the TCA replaced "commercial motor vehicle" in the definitions of motor carrier and motor private carrier with "motor vehicle," essentially returning the Secretary of Transportation's authority to its pre-SAFETEA-LU scope.[9] District courts have concluded that the TCA amendment was not retroactive, and no party in this case argues that the TCA amendment is retroactive.

Thus, for the time period between August 10, 2005 and June 6, 2008, many employees who had been exempt from the FLSA's overtime provisions under the MCA exemption were no longer exempt. However, the TCA included a safe harbor period of one year, from August 10, 2005 to August 9, 2006, for any failure by an employer to pay overtime compensation pursuant to the FLSA by employers who did not have actual knowledge that the scope of the exemption had changed when the SAFETEA–LU was enacted in 2005. 122 Stat. 1572, 1620 § 306(b)(1). Section 306 of the TCA also addressed application of the FLSA's overtime requirements going forward:

> SEC. 306. APPLICABILITY OF FAIR LABOR STANDARDS ACT REQUIREMENTS AND LIMITATION ON LIABILITY.
>
> (a) APPLICABILITY FOLLOWING THIS ACT.–Beginning on the date of enactment of this Act, section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) shall apply to a covered employee notwithstanding section 13(b)(1) of that Act (29 U.S.C. 213(b)(1)).
>
> . . . .

---

[9] Pub. L. No. 110-244, § 305(c), 122 Stat. 1572, 1620 ("DEFINITIONS RELATING TO MOTOR CARRIERS.—Paragraphs (6)(B), (7)(B), (14), and (15) of section 13102 of such title are each amended by striking 'commercial motor vehicle (as defined in section 31132)' and inserting 'motor vehicle'.").

No. 10-20424

(c) COVERED EMPLOYEE DEFINED.–In this section, the term "covered employee" means an individual–

(1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);

(2) whose work, in whole or in part, is defined–

    (A) as that of a driver, driver's helper, loader, or mechanic; and

    (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles–
        (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
        (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
        (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Pub. L. No. 110-244, §§ 305-06, 122 Stat. 1572, 1620-21 (effective June 6, 2008).

Plaintiffs filed this lawsuit on February 11, 2008. Because they allege willful violations of the FLSA, the potential limitations period extends back to February 11, 2005. Throughout this time period, and despite the various amendments to the MCA, Congress did not amend the definition of "commercial

No. 10-20424

motor vehicle," and the DOT had in place an existing regulation defining "commercial motor vehicle." It provides:

> Commercial motor vehicle means any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle–
>
> (1) Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater; or
>
> (2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or
>
> (3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
>
> (4) Is used in transporting [hazardous] material . . . .

49 C.F.R. § 390.5.[10]  Though this definition generally tracks the statutory definition of commercial motor vehicle, it adds the terms "gross combination weight rating" and "gross combination weight."

"Gross vehicle weight rating" ("GVWR") is defined in DOT regulations as "the value specified by the manufacturer as the loaded weight of a single motor vehicle." 49 C.F.R. § 390.5. "Gross combination weight rating (GCWR) means the value specified by the manufacturer as the loaded weight of a combination (articulated) motor vehicle. In the absence of a value specified by the manufacturer, GCWR will be determined by adding the GVWR of the power unit and the total weight of the towed unit and any load thereon." *Id.* "Gross vehicle

---

[10] This regulatory definition has been in place since 1999. The Federal Highway Administration ("FHWA") issued a revised regulatory definition of "commercial motor vehicle," effective September 3, 1999, in response to the 1998 TEA-21 amendment to the definition of commercial motor vehicle. 64 Fed. Reg. 48510-01, 48515.

weight" ("GVW") and "gross combination weight" are not defined in the statute or the regulations.[11]

On appeal, Plaintiffs' main contention is that the DOT regulation defining "commercial motor vehicle" should not be afforded *Chevron* deference because the regulation, which allows combinations of vehicles in determining GVWR or GVW, contravenes the plain statutory text, which does not allow combinations of vehicles. However, Plaintiffs did not raise their *Chevron* argument in the district court either in their summary-judgment briefing or in their Motion to Alter or Amend Judgment. Thus, they have waived this argument. *See Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008) ("[T]he CFTC waived any reliance on *Chevron* deference by failing to raise it to the district court."); *see also Faris v. Williams WPC-I, Inc.*, 322 F.3d 316, 319 n.2 (5th Cir. 2003) ("Defendants also argue that, if the regulation extends to the waiver at issue here, it is invalid under *Chevron U.S.A. Inc. v. N.R.D.C.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This argument was not presented to nor passed on by the district court, and therefore may not be considered on appeal.").

Even if Plaintiffs had not waived this argument, however, it lacks merit. Plaintiffs contend that the statute is unambiguous, that *Chevron* deference applies only in the case of ambiguous statutes,[12] and that the DOT regulation is

---

[11] The FHWA notice of interim final rule stated that "Section 4008 [of TEA-21] also changed the weight threshold in the CMV definition by adding 'gross vehicle weight' (GVW) to the previous 'gross vehicle weight rating' (GVWR). The agency may now exercise jurisdiction based on the GVW or GVWR, whichever is greater. A vehicle with a GVWR of 9,500 pounds that was loaded to 10,500 pounds GVW would therefore be subject to the FMCSRs if it was operating in interstate commerce." 64 Fed. Reg. 48510-48511. This indicates that "gross vehicle weight" means the actual loaded weight of a vehicle.

[12] *Martinez v. Mukasey*, 519 F.3d 532, 542-43 (5th Cir. 2008) ("Under *Chevron*, we defer to agency interpretations of ambiguous statutes. . . . Deference of this sort however, is not owed automatically to all agency interpretations of statutory provisions; again, there must be ambiguity.").

therefore not entitled to any deference. Because the statute is unambiguous, Plaintiffs argue, the Court should apply the statute's plain language and hold that either the truck or the trailer alone must weigh over 10,000 pounds for the vehicle to qualify as a commercial motor vehicle.

Because the statute refers to a "self-propelled *or* towed vehicle" that weighs over 10,000 pounds, Plaintiffs assume that a self-propelled vehicle can mean only the truck excluding any towed vehicle. However, both a truck without a towed vehicle and a truck with a towed vehicle can be a "self-propelled vehicle." As Plaintiffs themselves emphasize, the statute recognizes that a "motor vehicle" can be "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary." 49 U.S.C. § 13102(16). Thus, the use of the disjunctive "or" between self-propelled and towed does not necessitate Plaintiffs' conclusion that a self-propelled vehicle excludes any towed portion of that same vehicle, even though the definition of commercial motor vehicle does not itself include the "or a combination" language. Rather, the statute can be read to mean that a commercial motor vehicle is a self-propelled vehicle (which is a vehicle propelled by its own power, along with any towed vehicle drawn by it, if any) or a towed vehicle with a GVWR or GVW in excess of 10,000 pounds. *See Glanville v. Dupar, Inc.*, Civ. A. No. H-08-2537, 2009 WL 3255292, at *6 (S.D. Tex. Sept. 25, 2009) (concluding that the statutory definition of commercial motor vehicle "does not directly and unambiguously speak to the combination of a truck towing an attached trailer" but that "[t]he statute clearly contemplates a combination of a self-propelled vehicle with a towed attachment that could not travel down the highway by itself").

There is nothing in the statutory language that clearly excludes a combination vehicle from being a "self-propelled vehicle." Plaintiffs argue that Congress's choice of GVWR and GVW indicates that only the weight of a single

vehicle – as opposed to a combination vehicle – can be considered because these are measurements of the weight of a single vehicle. All parties agree that GVWR is defined by the regulations as "the value specified by the manufacturer as the loaded weight of a single motor vehicle." 49 C.F.R. § 390.5. On appeal, Plaintiffs assert that GVW is "the maximum payload that the vehicle was designed to carry," or "[t]he maximum loaded weight for which a single automobile is designed, as specified by the manufacturer." *Id.* However, this is not the same definition of GVW that Plaintiffs urged in the district court. They asserted in the district court that, "although not expressly defined, it is accepted that Gross Vehicle Weight ('GVW') means the actual weight of a commercial motor vehicle on a given day" (in their Motion for Summary Judgment) and that it means "the actual weight of a vehicle, plus the actual weight of cargo and passengers, on a given day" (in their Response to Defendants' Motion for Summary Judgment).[13] Nothing about these definitions indicates that one can consider only the truck without the trailer in determining GVW.

Citing a single district court case,[14] Plaintiffs assert that "[c]ourts have recognized that the gross vehicle weight rating 'is only appropriate for determining the weight of a vehicle that is not towing a trailer.'" Therefore, they assert, "the gross vehicle weight rating and gross vehicle weight, by definition, mean the weight of the truck or trailer by itself." Even if it is true that the GVWR can only apply to a vehicle not towing a trailer, which we do not decide,

---

[13] Plaintiffs do not acknowledge or discuss the difference between their proposed definitions of GVW in the district court and on appeal. Nor do they discuss how their current definition of GVW ("the maximum loaded weight for which a single automobile is designed, as specified by the manufacturer") differs functionally from the definition of GVWR ("the value specified by the manufacturer as the loaded weight of a single motor vehicle"). As noted, the term "or gross vehicle weight" was added to the definition of commercial motor vehicle in 1998, and thus Congress must have intended for it to have a meaning different from the existing term "gross vehicle weight rating."

[14] *Glanville*, 2009 WL 3255292, at *5.

Plaintiffs fail to explain why the same is necessarily true for the GVW, other than to note that, when a truck with a trailer is considered, other measures – gross combination weight rating and gross combination weight – are used. Thus, they assert that the DOT recognized that GVWR and GVW are measures for a single vehicle because it had to include the additional measurements to determine the combined weight of the truck and trailer. By choosing weight measurements that were limited to single vehicles, and omitting measurements that included combined vehicles, Plaintiffs argue, Congress unambiguously intended that either the truck or trailer by itself had to exceed 10,000 pounds.

The Court rejects Plaintiffs' argument that GVW can include only the weight of the truck without the trailer. A separate provision of the United States Code in the title governing highways uses GVW when expressly referring to combination vehicles: 23 U.S.C. §127(d)(4) states that the term "longer combination vehicle" means "any combination of a truck tractor and 2 or more trailers or semitrailers which operates on the Interstate System at a gross vehicle weight greater than 80,000 pounds." And, as noted, Plaintiffs themselves offer a different definition of GVW on appeal than they did in the district court, and their asserted definition in the district court – actual vehicle weight – does not exclude combination vehicles. Thus, Plaintiffs fail to support their argument that GVW can only apply to a truck without a trailer. If the GVW is the actual weight of a self-propelled vehicle (which can be a single or combination vehicle), then adding the actual weight of the truck and the actual weight of the trailer, as the district court did, is an appropriate method of determining the GVW. The regulation simply includes the term "gross combination weight" for this calculation.

Plaintiffs further assert that Defendants offer no explanation of why Congress defined a commercial motor vehicle as a "self-propelled *or* towed" vehicle that weighs over 10,000 pounds if it wanted the weight of both the self-

propelled and towed vehicles to be counted, in which case it would have used "and." But this argument overlooks the rest of the statutory definition of commercial motor vehicle and the role of the Secretary of Transportation in prescribing safety standards. A commercial motor vehicle is a self-propelled or towed vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle meets one of four separate criteria. The first criteria is that it have a GVWR or GVW of at least 10,001 pounds. The other criteria are: (1) that it is designed or used to transport more than 8 passengers (including the driver) for compensation; (2) that it is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or (3) that it is used in transporting hazardous material. The disjunctive language "self-propelled or towed vehicle" applies to all four criteria. Congress has mandated that "the Secretary of Transportation shall prescribe regulations on commercial motor vehicle safety" and that "[t]he regulations shall prescribe minimum safety standards for commercial motor vehicles." 49 U.S.C. § 31136(a). Among other things, the regulations shall ensure that commercial motor vehicles are maintained, equipped, loaded, and operated safely. *Id.* Thus, the disjunctive "or towed vehicle" clarifies and ensures that the Secretary maintains jurisdiction over trailers, semitrailers, and other towed vehicles that transport hazardous material or exceed 10,000 pounds, and that these types of towed vehicles are subject to the Federal Motor Carrier Safety Regulations.

Further, the regulation comports with the purpose of the statute as a whole. As the district court in this case recognized, the purpose of defining commercial motor vehicles to include large/heavy vehicles, certain passenger vehicles, and vehicles containing hazardous materials is to bring these vehicles within the jurisdiction of the Secretary of Transportation and the applicable safety regulations. Plaintiffs' construction results in coverage for a pickup truck

weighing 10,001 pounds or a trailer weighing 10,001 pounds, but does not result in coverage for a pickup truck weighing 10,000 pounds and towing a trailer weighing 10,000 pounds, for a combined weight of 20,000 pounds, even though such a vehicle implicates the same, if not greater, safety concerns.

The TCA also indicates that Congress was concerned with *total* vehicle weights and did not intend to exclude combination vehicles from the definition of commercial motor vehicle. As noted, the TCA defines a "covered employee" for purposes of the FLSA as an individual (1) who is employed by a motor carrier or motor private carrier; (2) whose work is defined, in whole or in part, as driver, driver's helper, loader, or mechanic and "as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . ."; and (3) who performs duties on motor vehicles weighing 10,000 pounds or less. Thus, this language references the overall weight of "motor vehicles," such that certain employees who work on motor vehicles weighing 10,001 or more pounds (*i.e.*, commercial motor vehicles) are under the jurisdiction of the Secretary of Transportation.

Last, as noted above, the regulatory construction of commercial motor vehicle was already in place when SAFETEA-LU and the TCA were enacted, but Congress did not change the definition of "commercial motor vehicle" in the SAFETEA-LU or the TCA or indicate that it was rejecting the existing regulatory definition. Thus, the district court correctly inferred that Congress intended the existing regulatory construction to continue to apply.

In sum, the statute is ambiguous concerning whether a "self-propelled vehicle" with a GVW in excess of 10,000 pounds can include both a truck and an attached trailer or other combination vehicles. Such a construction is not precluded by the statutory language, however, and is consistent with its purpose. Thus, section 390.5's definition of commercial motor vehicle comports with the statute and is reasonable. Accordingly, Plaintiffs' argument that the regulation

is not entitled to *Chevron* deference lacks merit.  Further, Plaintiffs fail to show that the district court's application of the regulation was erroneous.  On appeal, Plaintiffs essentially concede that "when combined – the trucks and trailers weighed over 10,000 pounds."  The district court's grant of summary judgment on Plaintiffs' overtime claim is therefore affirmed.

**B.**

In their second issue on appeal, certain Plaintiffs argue that the district court erred in granting summary judgment *sua sponte* on their minimum-wage claims, and that the error was harmful because their evidence raises a material fact issue.

Plaintiffs filed a "Motion for Partial Summary Judgment on Liability" regarding their minimum-wage claims.  Though the title of the motion indicated that Plaintiffs were seeking summary judgment "on liability," it was relatively clear that Plaintiffs were seeking summary judgment only on certain issues related to their minimum-wage claims.  Specifically, Plaintiffs stated that they were seeking "an order recognizing that Defendants failed to pay Plaintiffs for all compensable time under the FLSA" and that their motion presented four main issues: whether time spent receiving instructions and loading tools was compensable, whether time spent traveling was compensable, whether Taylor was individually liable, and whether Defendants violated the FLSA and Texas Labor Code by deducting $28 per pay period for workers' compensation insurance.  Plaintiffs stated that they were not moving for summary judgment on damages and would "present their testimony regarding damages at the time of trial."

In their conclusion, Plaintiffs expressly sought a summary-judgment ruling that: (1) "all of the time chipper- and crew foremen-Plaintiffs spent attending mandatory company meetings is compensable time"; (2) "all of the time chipper- and crew foremen-Plaintiffs spent attending training sessions

when first hired is compensable time"; (3) "all of the time chipper- and crew foremen-Plaintiffs spent at Defendants' Pasadena office receiving instructions and performing pre-trip work before departing for chipping sites is compensable time"; (4) "all of the time chipper- and crew foremen-Plaintiffs spent traveling from the Pasadena office to their first job site, between job sites and the return trip back to Pasadena is compensable time"; (5) Defendant Taylor is an employer in his individual capacity; and (6) Defendants violated the FLSA and Texas Labor Code § 415.006 by deducting $28 per pay period from each Plaintiff's paycheck to cover C2C's workers' compensation premiums.

Rather than responding to the specific issues raised by Plaintiffs' motion, such as whether the specified activities were compensable, Defendants' response contended that "Plaintiffs have failed to prove adequately that Defendants violated the minimum wage provisions of the FLSA." Defendants requested that the district court deny Plaintiffs' motion. Defendants stated, "Plaintiffs' argument is inadequate primarily because other than baldly asserting that minimum wage violations have occurred, Plaintiffs have done nothing else to prove these violations to this Court. The FLSA requires more of Plaintiffs than an inferential assertion that because certain hours were unpaid, a minimum wage violation therefore occurred." Defendants argued that Plaintiffs failed to meet their initial burden of showing that their actual compensation was less than the minimum wage, that Plaintiffs had not proven that their weekly pay divided by the number of hours worked in that week yielded an hourly rate for the whole week that was lower than the statutory minimum wage. Defendants stated that "Plaintiffs have not carried their burden, and their claims for minimum wage must be denied at the summary judgment level."

Plaintiffs filed a reply, in which they stated, "Notwithstanding Defendants' efforts to obfuscate, Plaintiffs do not move for summary judgment on their minimum wage claims." Plaintiffs repeated that they only sought an order on

No. 10-20424

specific issues related to whether certain activities were compensable, and asserted that "[a] ruling on the compensable time issue will allow a trial on Plaintiffs' minimum wage and overtime pay claims to proceed more efficiently and expediently by eliminating issues for which there is no legitimate dispute." Plaintiffs further asserted that "Defendants have tacitly conceded [that] the Court should declare that these activities are compensable as a matter of law" and "[r]ather than address whether pre-trip work, travel time, and other time is compensable, Defendants attempt to sidestep the issue." Plaintiffs stated, "Defendants simply miss the mark when they argue that Plaintiffs must prove compensable time violations 'with definite and certain evidence' of hours worked. . . . The issue presently before the Court is not the number of hours worked, but the compensable nature of the time."

Plaintiffs then acknowledged that their burden was ultimately to prove that they had performed work for which they were improperly compensated and to produce sufficient evidence to show the amount and extent of the work "as a matter of a just and reasonable inference," but stated that "Plaintiffs will discharge their burden under the lawful standard when the time is appropriate." Plaintiffs concluded, "[a]t this time, however, it is not necessary and would be premature because Plaintiffs simply did not move for summary judgment on their minimum wage claims."

Despite the fact that Plaintiffs made clear that they thought Defendants had not joined the issues presented in their motion, that they had not moved for summary judgment on their minimum-wage claims as a whole, and that it would be premature for them to have to come forward with their evidence of their actual wages received, the district court concluded that Plaintiffs were on notice of a potential summary judgment on overall liability because Defendants asked "in their response to plaintiffs' motion for summary judgment that the court deny these claims as a matter of law." The Court concludes that this was error,

21

and that Plaintiffs were not adequately placed on notice of a potential summary judgment on their minimum-wage claims.

It is true that Defendants' response stated at one point that "Plaintiffs have not carried their burden, and their claims for minimum wage must be denied at the summary judgment level." But this was not a clear request for the district court to grant summary judgment in Defendants' favor. And elsewhere in their response, including on the first page and in the conclusion, Defendants stated only that Plaintiffs had not proved their entitlement to summary judgment, and asked that the district court deny Plaintiffs' motion. Thus, it was not clear that Defendants were asking the district court to grant summary judgment in their favor on the minimum-wage claims. Moreover, Plaintiffs' response shows that Plaintiffs did not think that Defendants were moving for summary judgment such that Plaintiffs were required to respond with their evidence; rather, they reasonably construed Defendants' response as simply asserting that Plaintiffs were not entitled to summary judgment on liability because they had not offered evidence to support minimum-wage violations.

Given these facts, the district court should have taken the precaution of notifying Plaintiffs that it was considering summary judgment based on Plaintiffs' failure to establish that their effective hourly rates were below the minimum wage. *See Davis v. Howard*, 561 F.2d 565, 571 (5th Cir. 1977) ("Because a litigant 'cannot read over the judge's shoulder, or penetrate his memory,' the nonmoving party must also have some notice of what 'contention' or issue is placing his case in jeopardy.") (quoting *Soley v. Star & Herald Co.*, 390 F.2d 364, 369-70 (5th Cir. 1968)). Instead, the district court granted summary judgment without adequate notice to Plaintiffs.

All but six of the Plaintiffs filed a Motion to Alter or Amend the Judgment, arguing that the district court erroneously granted summary judgment without notice, and submitting evidence in support of their claims. Plaintiffs asserted

that they had no notice that the district court was considering summary judgment on the entire case, and that the summary judgment was harmful because Plaintiffs could adduce evidence supporting their minimum wage claims, as demonstrated by declarations of six Plaintiffs attached to the motion. Plaintiffs acknowledged that their motion was misnamed as a motion for partial summary judgment on liability, as they merely sought an order on specific issues relating to their minimum-wage claims to simplify the presentation of their claims for trial. Plaintiffs noted that Defendants did not ask the Court to grant summary judgment in their favor in the response brief, but simply asked the district court to deny Plaintiffs' motion. Thus, Plaintiffs stated, they did not present evidence to establish a *prima facie* case of minimum-wage violations, nor were they on notice that the court was considering dismissal of the entire case. Plaintiffs stated that, had they been on notice, they would have presented their evidence. The district court summarily denied Plaintiffs' motion.

On appeal, Plaintiffs make essentially the same arguments they made in their motion to alter or amend. Defendants argue that they did ask for summary judgment as a matter of law in their response brief and requested that Plaintiffs come forward with proof. They argue that this, and the fact that Plaintiffs filed a motion for summary judgment, put Plaintiffs on notice to come forward with their evidence in their reply brief, but they chose not to.

Defendants rely on two circuit court cases – *Gibson v. City of Wilmington*, 355 F.3d 215, 223-25 (3rd Cir. 2004) and *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 740-41 (7th Cir. 2002) – to support their position that the district court appropriately granted summary judgment. In *Gibson*, the Third Circuit Court of Appeals recognized an exception to the notice requirement for *sua sponte* summary judgment when three conditions are met: "(1) the point at issue is purely legal; (2) the record was fully developed, and (3) the failure to give notice does not prejudice the party." *Gibson*, 355 F.3d at 219. Plaintiff Gibson had

moved for summary judgment on the issue of whether the municipal policy under which he was terminated was overbroad and vague. The district court denied the motion, stating that there were genuine issues of material fact. However, on the morning of trial, the district judge invited counsel into chambers and "announced that he was granting summary judgment *sua sponte* to [defendant] on the issue of overbreadth." The Third Circuit noted that, because discovery was closed, "full opportunity for discovery had already obtained" and "[i]ndeed Gibson had every opportunity to present his position to the Court, and it was he who moved for summary judgment on the issues of vagueness and overbreadth." *Id.* at 223. The court found convincing the defendant's argument that, "in moving for summary judgment, Gibson had clearly marshaled enough evidence to support his case and was therefore not prejudiced by the lack of notice in the *sua sponte* grant of summary judgment." *Id.*

The *Gibson* court noted that the First Circuit has defined "notice" to mean "that the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" *Id.* at 223-24 (citing *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999)). "Given that it was Gibson who moved for summary judgment on the issues of vagueness and overbreadth," the Third Circuit reasoned, "he certainly had the opportunity to put his 'best foot forward.'" *Gibson*, 355 F.3d at 224. The court further noted that "other courts have taken the position that when a party has had the opportunity to present all the evidence that would be used to oppose a motion for summary judgment, the fact that the actual notice was not given becomes irrelevant if the party was not prejudiced by that lack of notice." *Id.* The court also positively cited to cases holding that a district court's *sua sponte* grant of summary judgment on purely legal questions based on complete evidentiary records was appropriate. The Court then held that the presence of all three

factors – a fully developed record, the lack of prejudice, and a decision based on a purely legal issue – would justify *sua sponte* summary judgment without notice, but it did not decide if fewer than all three would suffice.

The court cautioned, however, that "the *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims.  This is so not only because district courts run the risk of unduly prejudicing the parties, but also because such grants of summary judgment can have serious, if unintended, consequences." *Id.* at 224-25.  Thus, "it is preferable for the District Court to give notice to the parties when it is considering a *sua sponte* grant of summary judgment because of the potential consequences such a grant may engender." *Id.* at 225.

In *Jones v. Union Pacific R. Co.*, 302 F.2d 735 (7th Cir. 2002), the court noted that though "granting summary judgment *sua sponte* is a 'hazardous' procedure which 'warrants special caution' and is often unnecessary, it remains permissible." *Id.* at 740.  It held that "[w]hen there are no issues of material fact in dispute, a district judge may grant summary judgment in favor of the non-moving party or may grant summary judgment even though no party has moved for summary judgment . . . as long as the losing party is given notice and an opportunity to come forward with its evidence." *Id.* (citations omitted).  In *Jones*, the court found that the plaintiff was not deprived of the opportunity to present evidence when he "had moved for summary judgment and marshaled all the favorable evidence available in support of that motion" and "when [the plaintiff] moved for summary judgment *both parties* were on notice that summary judgment was under active consideration." *Id.* (emphasis in original).  Further, the court held, "the defendant's response to the plaintiff's motion for summary judgment put [the plaintiff] on further notice by stating that the court should consider the response 'in the nature of a cross-motion for summary judgment." *Id.*  The plaintiff therefore had an opportunity to respond to the defendant's

cross-motion statement in his reply brief, but chose not to do so, and raised no objection to the defendant's request for summary judgment. *Id.*

Both these cases are distinguishable on the facts.[15]  Despite some ambiguity in Plaintiffs' motion, it was ultimately clear that Plaintiffs did not move for summary judgment as to overall liability on their minimum-wage claims, but only sought a ruling on specific issues related to their claims (primarily the compensability of certain time).  Thus, this is not a situation in which a plaintiff moves for summary judgment and puts forth all its evidence on the issue on which the court then grants summary judgment *sua sponte* in favor of a non-movant defendant.  *See Kannaday v. City of Kiowa*, 590 F.3d 1161, 1171 (10th Cir. 2010) ("When a district court's *sua sponte* determination is based on issues identical to those raised by a moving party, the risk of prejudice is significantly lowered because 'the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.").  Instead, it was clear that Plaintiffs had not put forth their summary-judgment evidence on the issue on which the district court granted summary judgment, and did not realize the need to do so.

Defendants did not clearly and expressly move for summary judgment in their favor, and Plaintiffs objected to the fact that Defendants were complaining about a lack of evidence on overall liability in response to Plaintiffs' motion on different, limited issues.  Thus, Plaintiffs were not on notice of a pending

---

[15]  Defendants also cite *O'Mara v. GEICO General Insurance Co.*, Civ. A. No. 09-CV-229-GKF-FHM, 2010 WL 2690370 (N.D. Okla. July 2, 2010), in support of the district court's *sua sponte* summary judgment.  *O'Mara* is also distinguishable, however, because even though defense counsel stated at the hearing on the plaintiff's motion for summary judgment that he was not asking for summary judgment and preferred trial, plaintiff's counsel suggested at the motion hearing that the issue could be decided as a matter of law, and the court discussed with both counsel whether the court ought to grant summary judgment on the issue in favor of defendants.

summary judgment against them, and it should have been apparent that entry of summary judgment would have been an unfair surprise. Accordingly, the entry of summary judgment *sua sponte* was error. *See R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 650 (7th Cir. 2003) ("[T]he fact that [plaintiff] itself sought summary judgment for different reasons does not mean that it was fairly apprised of the ultimate basis for the district court's reasoning. This is the precise reason why our court has repeatedly explained that it is appropriate to grant summary judgment *sua sponte* only when it is clear that neither side will be disadvantaged or unfairly surprised by the move.").

However, failure to provide proper notice is harmless error "if the nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact." *Id*. Because Plaintiffs offered additional evidence, this Court reviews the evidence to determine whether it presents a genuine issue of material fact.

The district court granted summary judgment based on Plaintiffs' failure to meet their initial burden to show a violation of the minimum-wage requirement. Specifically, the district court found that the workers had produced no evidence concerning how many hours Plaintiffs worked for which they were not compensated and had not shown that their total number of weekly hours worked divided by their weekly pay was less than minimum wage.[16] The

---

[16] The district court derived this weekly average wage standard from *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960). Defendants urged application of this standard in the district court, and they do so on appeal. The workers did not take issue with this standard in the district court or on appeal. The Court therefore will determine whether the workers have presented sufficient evidence to create a material issue of fact under this standard. *But see Norceide v. Cambridge Health Alliance*, Civ. A. No. 10-CV-11729-NG, 2011 WL 3895126 (D. Mass. Aug. 28, 2011) (rejecting application of the weekly average wage standard in favor of an hour-by-hour standard).

district court further found that the minimum-wage claim related to the workers' compensation deductions failed for the same reasons – because they failed to show that this deduction reduced their pay below the applicable minimum wage.

In their motion to reconsider, Plaintiffs asserted that, had they been given notice, they would have filed evidence, including but not limited to the declarations of Pablo Chable, Antonio Ramirez, Ricardo Flores, Ernesto Ramos, Carlos Diaz, and Mariano Buendia. They contended that they "had no opportunity to submit this and other additional evidence because they did not receive notice." In a footnote to their motion, the workers stated that "[e]ach chipper logged the same or roughly the same number of compensated and uncompensated but compensable hours as the other chippers on their work crew resulting in a minimum wage violation for each plaintiff." The workers also asked the district court, upon granting their motion to reconsider, to determine whether C2C violated the FLSA by deducting $28.00 from each of their paychecks to pay the company's workers' compensation premiums and the other issues, such as compensability of certain activities, raised in the workers' motion for partial summary judgment.

Plaintiffs' additional evidence includes affidavits, spreadsheets, time logs, and pay records for six Plaintiffs – Pablo Chable, Antonio Ramirez, Ricardo Flores, Ernesto Ramos, Carlos Diaz, and Mariano Buendia. According to Pablo Chable's affidavit, he began working as a chipper in April 2006. Chable states that he was paid $11 per hour for 23 hours in the week of October 28, 2007, but once travel time was factored in, he was only effectively paid $5.31 per hour.[17] He also submitted a spreadsheet summarizing the total hours worked divided

---

[17] Travel time was estimated by dividing the miles traveled (derived from GPS records produced by Defendants) by 50 mph. Plaintiffs state that the speed limit was 65 mph, but 50 mph was used to be conservative. Whether this is a reliable method of determining travel time has not been challenged by Defendants, and the Court makes no determination on this issue.

by the hourly pay for the weeks ending September 30, 2007 through February 24, 2008. The spreadsheet shows that he was also paid less than minimum wage for the weeks ending January 6, 2008, January 27, 2008, and February 17, 2008, and that Chable was thus owed $510.59 for the period between September 2007 and February 2008. The spreadsheet then estimates an average amount owed per week of $30.08 ($510.59 divided by seventeen weeks worked). Since Chable worked 98 weeks, the spreadsheet then estimates a total amount of minimum wages owed as $2,943.40. This does not include the additional amount withheld for workers' compensation premiums, which is estimated at $1,372, and would further reduce Chable's effective hourly pay rate.

The evidence submitted by the other five chipper Plaintiffs is similar. Given the status of this case, in which no determination has yet been made regarding the compensable nature of the time spent receiving instructions and loading tools, traveling from Pasadena to job sites, in between job sites and back to Pasadena, and the time spent at training meetings, this evidence is sufficient to raise a fact issue on the minimum-wage claims of the affiants.

Defendants contend that, even if the summary-judgment evidence submitted by the six Plaintiffs raises a material fact issue as to their claims, summary judgment should nevertheless be affirmed as to all other Plaintiffs. These other Plaintiffs include certain named Plaintiffs – Alvaro Albanil, Antonio Buendia, Santos Chable, Jose Herrera, Elvin Marin, and Noe Martinez – and all the opt-in Plaintiffs except Ernesto Ramos, who submitted evidence.[18] Plaintiffs assert that all workers were paid the same way, and thus their evidence is sufficient to raise a fact issue on all of the workers' claims, though each worker

---

[18] As noted, six of the workers (four chippers and the two foremen) admitted that their hourly rates were high enough that, even considering non-compensated time, they were paid more than the minimum wage. Thus, summary judgment as to these Plaintiffs is appropriate.

will have to provide evidence at trial to support both liability and their specific damages.

Where an employer has failed to maintain accurate payroll records, an employee carries his burden to establish a *prima facie* case under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). This court and other circuit courts of appeals have recognized that the *Mt. Clemens Pottery* standard allows plaintiffs to establish a *prima facie* case for non-testifying employees based on the "fairly representational" testimony of other employees. *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (holding that the plaintiffs established a prima facie case that all plaintiffs worked unreported hours through representative testimony); *see also Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("In meeting the burden under *Mt. Clemens*, the Secretary need not present testimony from each underpaid employee; rather, it is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA."); *Reich v. S. Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995) ("[T]he Secretary can present testimony from representative employees as part of his proof of the prima facie case."); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991) (recognizing that "the Secretary can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement."); *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1298 (3d Cir. 1991) ("The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations."); *Brock v. Norman's Country Mkt., Inc.*, 835 F.2d 823, 828 (11th Cir. 1988) ("[I]t is clear that each employee need not testify in order to make out a prima facie case of the number

of hours worked as a matter of 'just and reasonable inference.' "); *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (five employees were sufficiently representative of twenty-eight plaintiffs). "[M]ost cases resting on representational evidence 'involve a fairly small employee population, a limited number of employee positions, and uniform work tasks.'" *Reich*, 121 F.3d at 67. In this case, Plaintiffs submitted affidavits and other evidence from six Plaintiffs as representative testimony for approximately thirty-five chipper Plaintiffs.

In *Brennan*, reviewing the trial court's findings under a clearly erroneous standard, we affirmed a judgment in favor of thirty-seven employees on their overtime claims when the district court found, based on the testimony of sixteen representative employees and an investigator, that a certain class of employee worked unreported overtime hours. *Brennan*, 482 F.2d at 829. We held that, from these two sources, "the trial court might well have concluded that plaintiff had established a prima facie case that all thirty-seven employees had worked unreported hours" such that the burden of proof shifted to the defendant to show which of the employees had reported all overtime hours. *Id.*

Further, in *Beliz v. W.H. McLeod & Sons Packing* Co.,765 F.2d 1317 (5th Cir. 1985), we reversed a summary judgment on the plaintiffs' minimum-wage claims where the district court found that evidence concerning hours worked by individual plaintiffs was lacking. Taking into account the testimony of a few witnesses regarding the number of hours worked by the family groups of workers, it was apparent from the pay records that there was an egregious minimum wage violation for every worker in the crew. *Id.* at 1331. Therefore, "the only inexactness that could be found in the plaintiffs' case lay in the evidence concerning the hours worked by each member of each family unit." *Id.* Three plaintiff witnesses testified about the hours they, their spouses and children, and other families worked. *Id.* We held, "[I]t is clear that each employee need not testify in order to make out a prima facie case of the number

of hours worked as a matter of just and reasonable inference." *Id.* Testimony of some employees concerning the hours worked by groups of non-testifying employees is sufficient if those who do testify have personal knowledge of the work performed by those who do not. *Id.* Thus, the testimony of three witnesses who testified about the hours their families and other families worked was sufficient to approximate the number of hours worked.

In *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed. App'x 448 (5th Cir. 2009), we affirmed summary judgment against those plaintiffs in a collective action who came forward with no summary-judgment evidence and had not provided any substantive answers to the defendant's interrogatories. *Id.* at 455-56. The appellants argued that there was a "common nucleus of liability facts" among all of their claims, but after reviewing the evidence, we found instead that "the details surrounding each of their claims vary in significant ways, such that few if any of the appellants" were similarly situated for purposes of the FLSA. *Id.* at 456. Further, we found that "the claims of all those appellants who [had] not produced *any* evidence at all . . . necessarily fail[ed]" because those appellants had numerous opportunities to provide deposition testimony, affidavits, documents, or answers to interrogatories in support of their claims. *Id.* But as it stood, we knew "nothing of those appellants other than their names and the fact that they were allegedly employed in some unidentified capacity." *Id.*

This case, in contrast to *Von Friewalde*, satisfies the requirement that the testifying employees are "fairly representational." Because the two foremen Plaintiffs did not challenge the award of summary judgment on the minimum-wage claims, all remaining Plaintiffs are chippers. The parties stipulated that the chippers were employees of Defendants during the relevant time periods. In certifying the chipper class, the district court found and Defendants admitted "that all of their chippers perform the same or similar duties as the named

plaintiffs and receive pay similar to the named plaintiffs." The district court further found that the chippers regularly work in excess of forty hours per week while they are traveling, the chippers perform the same or similar duties, that all chippers are subject to a common pay policy, and that the experiences of the named plaintiffs are typical to those of the other chippers.[19] In addition, the affidavits submitted by the six chippers all state that they worked side-by-side with the other chippers on their crew; that they traveled together and performed the same work; and that they had seen their paychecks and they also were not paid for time spent performing work before departing Pasadena, or traveling to and from Pasadena and between chipping sites. Further, Defendants have admitted to deducting $28 from every chipper's paycheck for workers' compensation insurance, which would further reduce the workers' hourly wage rate.[20]

Given the procedural posture of this case, the evidence submitted is sufficient to raise a fact issue concerning all of the appealing chippers' minimum-wage claims such that remand of their claims is appropriate. On remand, once the district court makes the predicate determination of what activities are compensable,[21] Plaintiffs should be able to come forward with a more exact

---

[19] Defendants have not cross-appealed or otherwise challenged the district court's certification order or any of its findings therein.

[20] Defendants also contend that Plaintiffs have waived their claims based on the workers' compensation deduction in relation to their minimum-wage claim by failing to specifically address it in their appellate brief. However, it is undisputed that Defendants deducted $28 from every chipper's paycheck, and the workers' compensation deduction is simply an aspect of Plaintiffs' minimum-wage claim. The district court dismissed this aspect of the claim on the same basis as the rest of the minimum-wage claim – that Plaintiffs failed to show that their actual wages were below the minimum wage – and Plaintiffs have appropriately preserved, briefed, and submitted evidence related to their minimum-wage claim, including the workers' compensation deductions.

[21] The district court assumed without deciding that the activities were compensable as argued by Plaintiffs, and held that Plaintiffs had not demonstrated a minimum-wage violation even considering those hours. Because we reverse the district court's grant of

determination of their actual hourly wages. On remand, we leave to the district court in the first instance the determination of how to obtain precise proof of damages regarding each remaining plaintiff.

## III.

We AFFIRM IN PART the judgment of the District Court with regard to all Plaintiffs' overtime claims and with regard to the minimum-wage claims brought by Pedro Buendia, Gerardo Ramirez, Hector Albanil, Martin Albanil, Abel Ramirez, and Martin Rivas. We REVERSE the judgment of the District Court with regard to the remaining Plaintiffs' minimum-wage claims and REMAND for further proceedings consistent with this opinion.

---

summary judgment on the issue of whether Plaintiffs demonstrated that they were paid less than minimum wage, the determination of whether the activities were compensable is once again a live issue. On remand, the district court should evaluate Plaintiffs' motion for summary judgment and accompanying evidence to determine whether Plaintiffs satisfied their summary-judgment burden. *See John v. State of La.*, 757 F.2d 698, 709 (5th Cir. 1985) (holding that, "[i]n the light of Rule 56's clear command that a party need not respond to a motion for summary judgment unless the moving party discharges its initial burden," a summary judgment cannot be supported solely on the ground that a party failed to respond to a motion for summary judgment).